UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-66-B-W |
| | ) | |
| ROCHELLE KENNEY, | ) | |
|     Defendant. | ) | |

### ORDER ON MOTION DIRECTING THE RETURN OF PHYSICAL EVIDENCE

Over the Defendant's objection and acting pursuant to the All Writs Act, the Court orders the Defendant to return a sample of blood to the Government to allow scientific testing of its contents.

**I.  STATEMENT OF FACTS**

    **A.  The Indictment**

On September 24, 2007, Rochelle Kenney was indicted for supplying her late brother, John Kenney, with methadone and causing his death. *Indictment* (Docket # 1). Specifically, the Indictment charges that Ms. Kenney engaged in a scheme to report misinformation to her substance abuse treatment provider and others in order to obtain doses of methadone, clonazepam, and diazepam, some of which she then diverted to her brother. The Indictment alleges that John Kenney died on April 26, 2005 as a result of his use of the methadone Ms. Kenney supplied. The Indictment contains three counts: (1) Count I – Health Care Fraud – an alleged violation of 18 U.S.C. § 1347; (2) Count II – Unlawful Distribution (Methadone) – an alleged violation of 18 U.S.C. § 841(a)(1); and, (3) Count III – Unlawful Distribution (Diazepam) – an alleged violation of 18 U.S.C. § 841(a)(1). In addition, Counts One and Two

allege that the enhanced penalty provisions of sections 1347 and 841(b)(1)(C) apply to the charged crimes.[1]

To prove Count One, the Government must demonstrate that Ms. Kenney knowingly and willfully executed a scheme or artifice to defraud a health care benefit program and to obtain by false or fraudulent pretenses the delivery of or payment for health care benefits or services. To prove Counts Two and Three, the Government must demonstrate that Ms. Kenney knowingly or intentionally possessed these controlled substances with the intent to distribute them. To establish the enhanced penalties for Counts One and Two, the Government must prove that Mr. Kenney died as a consequence of his ingestion of these controlled substances.

### B. Why John Kenney Died

Why John Kenney died on April 26, 2005, has become a central focus of the Government's case and Ms. Kenney's defense. The answer to this critical question, however, has become immeasurably complicated by the failure of the Government's laboratory, Central Valley Toxicology (CVT) of Clovis, California, to follow standard scientific procedure. Upon Mr. Kenney's death, a physician from the Maine Medical Examiner's Office drew a sample of his blood and sent the sample to CVT; CVT conducted a toxicology test of the blood sample. Based on CVT's results, the state medical officer concluded that Mr. Kenney has died of acute methadone and diazepam toxicity. This conclusion led to Ms. Kenney's indictment.

### C. A Botched Test

After Ms. Kenney was indicted, defense counsel requested that the Government provide a sample of Mr. Kenney's blood so that it could be retested. The Government discovered that the

---

[1] 18 U.S.C. § 1347 provides that if the violation results in death, the defendant may be imprisoned for any term of years or for life; 21 U.S.C. § 841(b)(1)(C) provides that if the violation fits within certain type or quantity limits and results in death, the defendant is subject to a mandatory minimum period of incarceration of not less than twenty years and may be imprisoned for life.

state of Maine had destroyed its sample, but CVT still had its sample. On December 21, 2007, defense counsel asked that 6-8 ml of Mr. Kenney's blood be sent from CVT to NMS Labs in Willow Grove, Pennsylvania. The Government forwarded the request to CVT and asked it to comply.

On January 15, 2008, the Government received a letter from Bill Posey, the CVT Director, confirming that CVT had failed to follow standard laboratory procedure in testing Mr. Kenney's blood and that he had to recant his original opinions. Mr. Posey said he could not retest the blood sample because the entire sample – approximately 9 ml – had been sent to NMS at the Government's direction. The Government retained a new laboratory, AIT Labs, and asked defense counsel to send the sample to AIT for testing.

### D. A Question of Quantity

Defense counsel balked and the Government moved under the All Writs Act for an order requiring the Defendant to return the blood sample. *Government's Mot. for Order Directing the Return of Physical Evidence* (Docket # 56) (*Govt.'s Mot.*). The dispute centers on the amount of blood necessary to perform adequate toxicology tests. Ms. Kenney supplied an affidavit from Dr. Laura Labay, a forensic toxicologist from NMS, in which Ms. Labay stated that on January 4, 2008, NMS received 7.8 ml of blood from CVT. Dr. Labay initially understood that the entire sample would be available for testing and she directed that the laboratory commence drug-specific testing. On or about January 18, 2008, she received word that quality control issues had been discovered at CVT and, at that point, NMS stopped all testing. As of January 18, 2008, approximately 5.5 ml of blood remained in NMS custody. Dr. Labay has stated that she planned to use an additional 4.1 ml of blood to test for clonazepam, benzodiazepine, and cocaine, based on the minimum volumes necessary to obtain scientifically reliable test results.

Presumably on the assumption that the CVT test results were scientifically valid, NMS had focused its testing on the presence of other drugs. With the news that the CVT testing may have been compromised, however, NMS plans to perform a comprehensive drug screening test. It is unlikely that the amount of blood that remains – 5.5 ml – would be sufficient to conduct a comprehensive drug screen and leave enough volume for confirmation testing of clonazepam, benzodiazepine, and cocaine. Further, AIT, the Government's new laboratory, has requested a sample of 5.0 ml. If NMS were to turn over 5.0 ml, this would leave only 0.5 ml, a volume inadequate for independent testing. In sum, in response to the Government's request, the Defendant argues that "fundamental fairness and due process require that [she] be given sufficient access to test existing evidence so as to fully investigate her defense." *Def.'s Resp. to Government's Mot.* at 6-7 (Docket # 76).

The Government responds that the defense's argument misses the essential point that the burden to prove that Mr. Kenney's death resulted from methadone or other drugs rests solely with the Government. In other words, if the Government cannot gain access to the blood, there will be no need for the defense to retest the sample. The Government also points out that its laboratory is able to perform a comprehensive test with only 3.0 ml.

## II. DISCUSSION

### A. All Writs Act

The Government's motion is a request that the Court, under the authority of the All Writs Act, order the Defendant to return the remaining sample of John Kenney's blood to the Government. The All Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The

purpose of the Act is "to supply the courts with the instruments needed to perform their duty . . . ." *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Specifically, "courts may rely upon this statute in issuing orders appropriate to assist them in conducting factual inquiries." *Id.* at 299. A district court "may rely on the All Writs Act to control actions or conduct that would inhibit its ability to resolve or manage a case before it."[2] *Rubin v. Smith*, 882 F. Supp. 212, 219 (D.N.H. 1995) (citation omitted). The decision to issue an order under the Act is discretionary: "It must be emphasized that the Act . . . is entirely permissive in nature; it in no way mandates a particular result or the entry of a particular order." *Application of United States in Order Authorizing use of Pen Register*, 538 F.2d 956, 961 (2d Cir. 1976) *rev'd on other grounds sub nom. United States v. New York Tel. Co.*, 434 U.S. 159 (1977). In addition, "the power conferred by the Act extends, under appropriate circumstances, to persons who though not . . . engaged in wrongdoing are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *In re Grand Jury Proceedings of United States*, 626 F.2d 1051, 1059 (1st Cir. 1980) (quoting *New York Telephone Co.*, 434 U.S. at 174).

       **1.**    **Examples of Use of the All Writs Act**

The First Circuit has found that an All Writs Act order was appropriate to prevent the destruction of records in controversy, thereby frustrating the government's right to appeal. The Court explained that "[d]estruction of the evidence would have marred this court's exercise of

---

[2] The Defendant, arguing against the issuance of an All Writs Act order, focuses on a specific type of writ not applicable to the question at hand: the writ of mandamus. A writ of mandamus is "issued by a superior court to compel an inferior court or a government officer to perform mandatory or purely ministerial duties correctly." Black's Law Dictionary 973 (7th ed. 1999). For obvious reasons, a writ of mandamus is seen as upsetting the traditional relationship between courts and "must be used stintingly and brought to bear only in extraordinary circumstances." *Doughty v. Underwriters at Lloyd's, London*, 6 F.3d 856, 865 (1st Cir. 1993). Here, the Government is not requesting a mandamus, and therefore the heightened hurdles encouraged by the Defendant, requiring a "clear and indisputable right," do not apply.

jurisdiction, either rendering moot the question today decided or making a mockery of our consideration of the government's case." *In re Grand Jury Proceedings of United States*, 626 F.2d at 1059. In *Li*, the Seventh Circuit upheld the issuance of an All Writs Act order, which directed the collection of handwriting exemplars. *United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995). In *Li*, the Court found that the exemplars were "common legal instruments in criminal trials . . . [and] were crucial to a determination of guilt or innocence." Id.

### B. Due Process

The First Circuit has found that "a defendant has a due process right to request and receive evidence that the government possesses which is material to his guilt or punishment." *United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993). At the same time, this right is not absolute. For example, the fact that evidence had been destroyed and cannot not be inspected by a defendant may not amount to a due process violation. See *California v. Trombetta*, 467 U.S. 479, 490 (1984) (an OUI case in which the breath sample was not preserved); *United States v. Dela Espriella*, 781 F.2d 1432, 1438 (9th Cir. 1986) (Government failed to preserve the currency that narcotics canine alerted on, therefore, the defendant was unable to test for the presence of cocaine, however, no due process violation was found where the defendant had "ample opportunity to challenge the reliability of the dogs involved"); *United States v. Bucci*, 468 F. Supp. 2d 251, 253-54 (D. Mass. 2006) (rejecting defendant's argument that he was left without a means of challenging evidence that the (destroyed) marijuana in question weighed 453 pounds because he could challenge the reliability of the DEA testing equipment and cross-examine the individuals who weighed the marijuana). In each of these cases, the court focused on the alternative means of demonstrating innocence other then testing the actual evidence.

In contrast to the present case, the cases cited by the Government involve evidence that had been destroyed.  Here, the sample of blood is not unavailable; rather, there is an insufficient quantity of blood for both the Defendant and the Government to conduct separate testing.  In effect, if either the Government or the Defendant is allowed to complete its testing, the sample will be destroyed for the purposes of any additional testing by the other party.   In recognition of the fact that any additional testing will consume the remaining sample of blood, the Government argues:

> The defendant's Due Process rights will be preserved not only through the tests that she has already conducted, but through her ability to inspect the devices used to conduct the Government's tests, her review of the Government's test results, raw data, calibration data, and her ability to cross examine the Government's expert at a *Daubert* hearing or trial.  Indeed, the Government is even prepared to allow her expert the extraordinary opportunity to be present when the Government's expert conducts his tests.

*Government's Reply in Further Support* at 6 (Docket # 83).  The Government has also stated that its tests will be able to detect "the presence of over 250 drugs of abuse . . . effectively addressing any question of whether any drugs, other than methadone or diazepam, were in Kenney's blood at the time of death." *Id.*

Although the Government argues that the contents of the blood sample are "of central importance [to determine] the defendant's guilt or innocence," the Government overstates the case.  *Govt.'s Mot.* at 7.  The resolution of the three counts does not necessarily depend on the results of the laboratory tests.  Count One alleges that Ms. Kenney engaged in this scheme "to distribute the remainder of the daily dose to others, including, but not limited to, John Kenney." *Indictment* at ¶ 7.  It goes on to allege that Ms. Kenney gave portions of her home dose not only to her brother, but also to her sister, Julie Kenney.  *Id.* at ¶ 12.  It makes similar allegations about her distribution of clonazepam and diazepam.  *Id.* at ¶ 16.  Count Two and Count Three allege

7

the knowing and intentional distribution of methadone and diazepam, but based on the earlier allegations, the charges do not stand or fall on Mr. Kenney alone. In fact, Count Three does not allege that the diazepam caused Mr. Kenney's death and his blood sample does not appear to be an issue in Count Three.

Nevertheless, the blood sample is a critical piece of evidence for the Government's allegation that Ms. Kenney distributed drugs to her brother and that those drugs caused his death. Whether she is subject to enhanced penalties, ranging from a minimum of twenty years incarceration to life in prison, is unarguably significant both to the Government and to Ms. Kenney. On this issue, as noted by the Government, "[t]he bottom line is that if the blood sample is not returned to the Government for additional testing, there is no death resulting case against the defendant and, therefore, no need for her to do additional testing on the blood." *Government's Reply in Further Support* at 2. The All Writs Act may be used "in issuing orders appropriate to assist [the court] in conducting factual inquiries," *Harris*, 394 U.S. at 299, and "to control actions or conduct that would inhibit its ability to resolve or manage a case before it." *Smith*, 882 F. Supp. at 219. Ultimately, a "district court has wide latitude under the All-Writs Act to construct any remedy necessary to achieve justice." *Id.* (citation omitted).

The Court notes that this is not a situation where the Defendant procured evidence that she does not wish to share with the Government. Here, the Government obtained the evidence from the state medical examiner's office, had the sample tested, and shared the sample with the Defendant. It does not ask the Defendant to turn over something it never had; it only asks the Defendant to return something it sent to her.

The Court concludes that it must order the Defendant to arrange for the return of the blood sample to the Government, specifically to arrange for NMS to ship the blood sample to

AIT, in accordance with standard laboratory procedure. The Court notes that the dispute centers on what appears to be a standardized scientific testing procedure and whether Mr. Kenney's blood contained drugs when he died seems susceptible to resolution by the application of standardized scientific methodology. There is no basis for the Court to conclude that if properly tested, the result would be different whether done by AIT or NMS. As Ms. Kenney has no incentive to test the blood sample, which may help prove the Government's case, or to disclose inculpatory results, the Government must be given an opportunity to test the blood. If the tests do not demonstrate drug levels compatible with the Government's theory of the case, it will be required to reassess its prosecution.

If the tests are consistent with the Government's charges, it is true that Ms. Kenney will likely not have the opportunity to scientifically recheck the AIT results. However, she would be in no worse a position than those defendants who were deprived of independent verification because the Government destroyed the evidence. Further, Ms. Kenney has been able to test some of the blood sample already and to this extent, has not entirely lost the opportunity to make an independent assessment.

With this said, the major question appears to be whether the laboratory testing is performed strictly in accordance with accepted scientific methodology. If Ms. Kenney's expert had been present during CVT's testing, her expert would have been able to assess its compliance with standard scientific procedures and she may have been able to defend the case based on a failure of proof under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Similarly, here, Ms. Kenney's need to be assured that the testing has been done properly can be addressed by allowing her expert to attend AIT's testing of the blood sample to oversee its adherence to

standard scientific procedures. Though not the same as a retesting, the presence of her expert is the next best thing.[3]

### III.  CONCLUSION

The Court GRANTS the Government's Motion for Order Directing the Return of Physical Evidence (Docket # 56) and ORDERS the Defendant to make satisfactory arrangements to send the remaining blood sample to the Government's designated laboratory. In addition, however, the Court ORDERS the Government to allow the Defendant's designated expert to attend the laboratory testing of the blood sample.[4]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of April, 2008

---

[3] The Court has considered the Defendant's additional equitable arguments. Any argument concerning the mishandling of evidence is available to the Defendant to challenge the Government's test results, further protecting her due process rights.

[4] Upon completion of its testing, the Government shall give notice to the Court at which point a date will be set for a *Daubert* hearing.